IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TODD GREEN, | § | |
| | § | No. 552, 2019 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID No.  1406002733(K) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: June 3, 2020
Decided:    August 17, 2020

Before **VALIHURA, VAUGHN,** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court of the State of Delaware.  **AFFIRMED.**

Benjamin S. Gifford, IV, Esquire, Wilmington, Delaware *for Appellant Todd Green*.

John R. Williams, Esquire, Department of Justice, Dover, Delaware for *Appellee State of Delaware*.

**TRAYNOR**, Justice:

Todd Green appeals from the Superior Court's denial of his motion for postconviction relief under Superior Court Criminal Rule 61. Green was arrested during the first week of June 2014 after his girlfriend's thirteen-year old daughter reported to her sister, a sexual abuse nurse examiner, and a Child Advocacy Center forensic interviewer that Green had raped her on the evening of May 28, 2014 and that "it wasn't the first time."[1] A Kent County grand jury returned a twenty-two count indictment against Green, and after a five-day trial in the Superior Court, a jury convicted him on three of those counts: attempted rape in the second degree, attempted sexual abuse of a child, and unlawful sexual contact in the second degree. After a pre-sentence investigation, the Superior Court sentenced Green to a cumulative period of Level V incarceration of 50 years and nine months.

Green appealed his convictions to this Court, arguing that the jury's exposure to several instances of inadmissible testimony had a "cumulative prejudicial effect"[2] and deprived him of a fair trial. We rejected that argument and affirmed the Superior Court's judgment, concluding that "[a]ny prejudicial effect of the testimony relied upon by Green [was] . . . far outweighed by the overwhelming evidence of his guilt."[3]

---

[1] App. to Opening Br. at A176.
[2] *Id.* at A738.
[3] *Green v. State*, 147 A.3d 748 (Table), 2016 WL 4699156 (Del. Sept. 27, 2016).

Green then filed a timely *pro se* motion for postconviction relief, which was amended after the Superior Court appointed counsel. In his motion, Green alleged that his trial counsel was ineffective throughout the trial in violation of his Sixth, Eighth, and Fourth Amendment rights under the United States Constitution and under Article I, § § 4, 7, and 11 of the Delaware Constitution. Several of the issues at the heart of Green's ineffective-assistance claims were touched upon in our order denying Green's direct appeal, but a few were not. So Green also alleged in his motion that his counsel on direct appeal was ineffective for not raising those issues.

As will be discussed more fully below, a Superior Court Commissioner "recommend[ed] that Green's motion be denied as procedurally barred by Rule 61(i)(3) and (4) for failure to prove cause and prejudice and as previously adjudicated."[4] The trial judge, without addressing the commissioner's procedural-bar analysis, adopted the Commissioner's Report and Recommendation and denied Green's motion.

In this appeal, Green drops his claim that his appellate counsel was ineffective but challenges the Superior Court's determination that his claims were procedurally barred and that his trial counsel rendered constitutionally effective representation. Although we agree with Green that his claims were not procedurally barred under Rule 61(i)(3) and (4), we conclude that Green's trial counsel's performance, viewed

---

[4] *State v. Green*, 2019 WL 6216247, at *7 (Del. Super. Ct. Nov. 21, 2019).

as a whole, did not fall below an objective standard of reasonableness. And we also agree with the Superior Court that Green has failed to show that but for his trial counsel's decisions—to the extent that their reasonableness might be questioned—it is reasonably probable that the outcome of his trial would have been different. Therefore, we affirm.

## I.    BACKGROUND

### A.    Factual Background

For the two years preceding his arrest, Green lived with Sarah Perkins's[5] mother, Tracy Flambeau, and her three daughters—Sarah (the complaining witness), Cindy Flambeau, and Tia Green—at three different residences in the Dover/Camden area: one in a subdivision known as Kent Acres, another a townhouse on Thames Street, and most recently in a house on Stevens Street. Tia is Green's biological daughter; Sarah and Cindy are not. Although Green and Tracy were not married, Sarah and Cindy considered Green to be their stepfather, and Sarah even referred to Green as "Dad." When Green was arrested, he was 35 years old; Sarah was a 13-year-old seventh grader.

According to Sarah, Green first sexually assaulted her approximately two years earlier when she was in the fifth grade. On that occasion, Green entered

---

[5] The Court has assigned pseudonyms for the complaining witness and, with the exception of Green, the members of her family. For the balance of this opinion, those for whom we have assigned pseudonyms will be referred to by their assigned first names.

Sarah's bedroom, closing the door behind him. He then removed Sarah's pants and engaged in both oral/vaginal and penile/vaginal intercourse with her. Because Sarah felt as though she "couldn't trust anybody,"[6] she did not tell anyone of the rape.

The following year, Green attacked Sarah again, this time in the basement of a townhouse into which the family had moved during the summer of 2012. Sarah was playing a video game when Green entered the basement, this time locking the door behind him. Sarah reported that Green then removed her clothing and "raped" her meaning "he licked [her] vagina . . . and penetrated [her] vagina"[7] with his penis. Green also attempted anal intercourse on that occasion. Once again, because she was "scared," Sarah did not tell anyone about this assault.

Fast forward yet another year. Sarah was now 13 years old and finishing her seventh-grade year. The family had moved to another house—this one on Stevens Street—since Green raped Sarah in the basement of the townhouse. It was the evening of May 28, 2014, and, because her mother had gone bowling and her sister Cindy was at work, Sarah was babysitting her half-sister Tia. At first, she and Tia were home alone as Green had taken Tracy to the bowling alley.

As Sarah slept in her bedroom with her door locked, Green unlocked the door with a key and "began to take Sarah's clothes off. [He] then licked Sarah's side [and

---

[6] App. to Opening Brief at A199.
[7] *Id.* at A200.

breast,] kiss[ed] down [her legs], and . . . licked [her] vagina . . . . [W]hen he was done, he penetrated [Sarah's] vagina with his penis."[8] Sarah explained that she tried to resist, kicking Green in his chest. Undeterred, Green ejaculated "on [Sarah's] butt [and then] wiped it off"[9] before leaving Sarah's bedroom.

Unlike the earlier assaults after which Sarah was too fearful to report what Green had done, this time Sarah "felt like [she] needed to tell somebody [because] [i]t was just time."[10] After discussing the matter with two friends, she tried to call her sister Cindy at work but could not get through. Eventually Cindy came home from work, and Sarah told her that "Todd raped me[,] and it wasn't the first time,"[11] prompting Cindy to call 911.

In short order, the Delaware State Police responded to Cindy's call. The first officer on the scene, Trooper Thomas Ford, spoke with Cindy as the reporting person, and then "ask[ed] a couple very brief questions" of Sarah so that he could identify the crime scene and preserve physical evidence. After Sarah identified the clothing she was wearing at the time of the assault, Trooper Ford "collected those items and put them in an evidence package and secured them in [his] vehicle."[12] One

---

[8] *Id.* at A202.
[9] *Id.* at A204.
[10] *Id.*
[11] *Id.* at A176.
[12] *Id.* at A185.

of those articles of clothing was a pink "skort"—a pair of shorts that resembles a skirt. Through forensic testing, sperm cells with a single-source DNA profile consistent with Green's known DNA profile were found on the skort.[13]

Trooper Ford remained with Sarah until her mother returned home from the bowling alley. He then accompanied Sarah and her mother and sisters to the hospital for a medical examination by a sexual assault nurse examiner ("SANE"), Dawn Culp. Culp, among other things, swabbed Sarah's chest and noted abrasions in her vagina. The State's forensic DNA analyst later extracted a mixed DNA profile from the swabbing of Sarah's right breast. The major contributor to that mixed profile had a profile consistent with the known profile of Todd Green.[14]

The next day, a forensic interviewer from the Child Advocacy Center ("CAC") interviewed Sarah. After observing the CAC interview and collecting photographic evidence from Sarah's bedroom, the chief investigating officer applied for an arrest warrant and, on June 5, 2014, Green was arrested and charged with twelve sexual offenses, the earliest of which was alleged to have been committed in

---

[13] According to Sarah Lindauer, a senior forensic DNA analyst, "[t]he probability of randomly selecting an unrelated individual with the DNA profile matching that of the sperm cell fraction from the skort and the known DNA profile from Todd Green is one in 5 septillion, 38 sextillion in the Caucasian population; one in 70 quintillion, 720 quadrillion in the African-American population; one in 1 septillion, 699 sextillion in the southeastern Hispanic population; and one in 4 septillion, 456 sextillion in the southwestern Hispanic population." App. to Opening Br. at A517.

[14] According to Lindauer, the statistical probability of randomly selecting an unrelated individual with such a matching DNA profile was the same as for the sperm cell fraction found on Sarah's skort. *See* n.13, *supra.*

7

February 2012 when Sarah was 11 years old and the last of which occurred on the night of Sarah's report to her sister.

### B.  Procedural Background

### 1.  Indictment and Re-Indictment

In September 2014, the grand jury returned an indictment, charging Green with twelve offenses. Three months later, Green filed a motion for a bill of particulars, seeking additional information about each of the charges. Specifically, Green asked the State to disclose, among other things, (1) the location and time of day for each offense; (2) for those charges alleging intercourse, the nature ("penile/vaginal, oral, anal, etc.")[15] of the intercourse; and (3) for the charges alleging unlawful sexual contact, the nature of the contact. After the State filed the requested bill of particulars, it presented the matter to the grand jury again, and this time the grand jury returned a twenty-two count indictment. So the State updated its bill of particulars.

As we understand the second indictment, which was the operative indictment at Green's trial, and the updated bill of particulars, the twenty-two counts can be divided into five subsets. The first subset of charges (Counts 1 through 4), according to the State, was committed between February 1, 2012 and August 30, 2012 in Sarah's bedroom in her family's Kent Acres residence. Likewise, the second subset

---

[15] App. to Opening Br. at A40.

8

(Counts 5 and 6) was committed in Sarah's bedroom in the Kent Acres house, but between April 1, 2012 and May 30, 2012. The third subset (Counts 7 through 10) occurred in the basement of Sarah's family's Thames Street residence between August 1, 2012 and August 31, 2013. The fourth subset (Counts 11 through 14) occurred between April 15, 2014 and May 15, 2014 in an unidentified room within the family's Stevens Street residence. And the fifth subset relates to the assault in Sarah's bedroom in the Stevens Street residence that brought this matter to a head on May 28, 2014. For clarity's sake, we will refer to the first two subsets as the Kent Acres Allegations, the third as the Thames Street Allegations, the fourth as the Prior Stevens Street Allegations, and the last group as the May 28, 2014 Allegations.

## 2. Green's Trial

Green's trial, which was held in June 2015, lasted five days. The State called eight witnesses: Sarah, her sister and mother, three police officers, the SANE nurse, and the forensic DNA analyst. The testimony of these witnesses produced the version of events described in the Factual Background above. After the prosecution rested, Green moved for a judgment of acquittal on Counts 5 and 6 (two of the six Kent Acres Allegations) and Counts 11 through 14 (all of the Prior Stevens Street Allegations). Because the State had not presented any evidence to support those counts, it did not oppose—and the court granted—Green's motion.

The defense called one witness—Green himself. Green's testimony was remarkably brief; his direct examination, much of which was devoted to questions about Green's background and places of residence, takes up only seven transcript pages. The State's cross-examination was less than half the length of defense counsel's direct, and there was no redirect examination. When asked to respond to the Kent Acres Allegations, Green responded curtly: "I deny the allegations . . . [b]ecause I would never do something like that to her or to anyone."[16] In like manner, when asked about the Thames Street Allegations, Green answered: "It's totally fabricated . . . [b]ecause I would never do something like that to [Sarah]."[17]

Green also denied the May 28, 2014 Allegations, saying that he had "never done anything to [Sarah] like that, never."[18] He explained that he had driven Tracy to the bowling alley that night and, after dropping her off, waited with a friend, Wallace Skinner, "until she [Tracy] was done [bowling.]"[19] Implicit in this testimony is the notion that Green was never alone during the time between his dropping off Tracy at the bowling alley and his return later that night to pick her up—that is, when Sarah said that Green had raped her. But notably, Wallace Skinner did not testify so Green's alibi was not corroborated.

---

[16] App. to Opening Br. at A559–60.
[17] *Id.* at 561.
[18] *Id.* at 562.
[19] *Id.* at 563.

Green also attempted to explain away the DNA evidence by claiming—in direct contradiction to the testimony of Sarah and the officer who collected the stained skort[20]—that "[t]he clothes came from the laundry room."[21] Green did not explain the significance of the clothes being in the laundry room. For instance, he does not say that his semen-stained clothing was also in the laundry room. But we understand that that was the inference his testimony was intended to support as, in her closing argument, Green's counsel noted the possibility Green's DNA was transferred from his clothing to Sarah's while in the laundry room.

### 3. The Jury's Verdict

Because the court had granted Green's motion for judgment of acquittal as to six counts, 16 counts remained for the jury to consider. After deliberating for approximately one-and-a-half hours, the jury returned its verdict finding Green guilty of three of those remaining counts—the May 28, 2014 Allegations—acquitting him of the rest. Seen in one light, it would appear that the jury harbored doubt about the allegations that were not timely reported and for which no physical evidence was presented. But that same doubt did not arise—it would seem—as to

---

[20] Both Sarah and Trooper Ford testified that the skort was found in Sarah's bedroom. Sarah said she picked up the skort from the floor and gave it to Ford, while Ford recalled that the skort had been on Sarah's bed.

[21] App. to Opening Br. at A564.

11

the May 28, 2014 Allegations, which were promptly reported and supported, the jury apparently believed, by damning forensic evidence.

### 4. Green's Direct Appeal

After Green was sentenced, he appealed to this Court. Green argued that "highly irrelevant and unfairly prejudicial evidence was admitted against [him] at trial which deprived [him] of a fair trial."[22] The evidence Green identified consisted of Cindy's testimony that she did not like Green because he hit Cindy's mother, the mother's testimony that Green had threatened to kill her and her children several years earlier, and the SANE nurse's testimony that she believed what Sarah told her during her physical examination.

Because Green did not object to Cindy's testimony at trial, we reviewed that claim for plain error and found none:

> Green has failed to meet his heavy burden to show that allowing the unobjected-to testimony was such fundamental error that it jeopardized the fairness of the trial. Although the testimony might have been stricken if there had been an objection, we find that the other admissible evidence of Green's guilt overcomes any prejudice from the older sister's isolated remark. The victim testified that Green raped her at the Stevens Street home, her older sister and Mother testified about the events following the rape, and Culp testified convincingly about the results of her sexual assault examination of the victim. Further, the DNA evidence recovered from the victim's clothes and her body matched Green's DNA. With such overwhelming evidence of guilt,

---

[22] App. to Opening Br. at A735.

Green has failed to show that the admission of the older sister's statement would have affected the outcome of the trial.[23]

Green did, however, object to Tracy's testimony that Green had threatened her and the children; in fact, the court sustained that objection. Thus, Green's claim was that the trial court erred by not giving a curative instruction. But Green had not asked for an instruction so we also subjected this claim to plain error review:

> A similar plain error analysis applies to this argument. After reviewing the record, we find that the isolated reference to threats that were allegedly made years before the rape was not so prejudicial as to undermine the fairness of Green's trial. Further, as we noted when reviewing the older sister's testimony, the overwhelming testimonial and physical evidence of his guilt outweighed any prejudice that might have occurred.[24]

Green's claim that the SANE nurse had improperly vouched for Sarah's credibility met a similar fate. After recognizing the impropriety of one witness bolstering or vouching for the credibility of another witness, we explained why the trial court's failure to declare a mistrial—a remedy Green did not request—was not plain error:

> [The SANE nurse's] comment was an isolated occurrence. The Superior Court asked Green's attorney more than once what action she wanted the court to take. Green's attorney did not ask for a mistrial, but instead asked that the statement be stricken from the record. The Superior Court complied and promptly instructed the jury to disregard Culp's statement. Under the circumstances, where the court took the steps requested by counsel to mitigate any prejudice, and no request

---

[23] 2016 WL 4699156, at *2.
[24] *Id.* at *3.

13

was made for a mistrial, the Superior Court did not plainly err by continuing with the trial.[25]

Finally, we rejected Green's contention that, regardless of whether the individual errors separately warranted reversal, their cumulative effect did, pointing out once again that they were "isolated events" and that "[a]ny prejudicial evidence . . . [was] far outweighed by the overwhelming evidence of guilt."[26] We therefore affirmed Green's convictions, and, on September 23, 2016, issued our mandate to the Superior Court.

### 5.  Green's Rule 61 Motion

In January 2017—well within the one-year period during which such motions must be filed—Green filed a motion for postconviction relief under Superior Court Criminal Rule 61. He simultaneously filed a motion for appointment of counsel, which the Superior Court granted. The court then referred the motion to a Superior Court commissioner. After reviewing the trial record, appointed postconviction counsel filed an amended motion; the denial of this amended motion is the subject of this appeal. Henceforth, we shall refer to the amended motion as the Motion.

Broadly speaking, Green made two claims in his 77-page Motion: (1) that Green's trial counsel did not provide him with effective representation throughout

---

[25] *Id.*  (footnotes omitted).
[26] *Id.*

14

his trial "in violation of Mr. Green's Sixth, Eighth, and Fourteenth Amendment Rights under the United States Constitution, as well as his Delaware constitutional rights under Article I, §§ 4,7, and 11;[27] and (2) that his appellate counsel was equally ineffective by "failing to raise arguably meritorious claims"[28] in Green's direct appeal. Green does not press the latter claim in this appeal, so our discussion is limited to his attack on his trial counsel's performance.

Although Green's Motion states his claim that his trial counsel was ineffective as a single claim, it consists of numerous separate contentions that trial counsel's performance was constitutionally deficient. Taken in the order in which the Motion presents them, they are that trial counsel was ineffective by:

- failing to object to Sarah's hearsay statements that came before the jury during Cindy's direct examination;

- failing to object to other testimony by Cindy that Green claims constituted impermissible vouching;

---

[27] App. to Opening Br. at A818. Green does not distinguish his Delaware constitutional rights from his rights under the federal constitution, nor does he present any separate argument regarding his Delaware constitutional rights. Accordingly, we do not address the argument that Green's state constitutional rights were violated because "it was not fully and fairly presented to this Court as an issue on appeal. *Ortiz v. State*, 869 A.2d 285, 290–91 (2005) (refusing to address an argument that defendant's rights under the Delaware Constitution had been violated where he "made no legal argument and cited no case or other authority in support of his conclusory declarative assertion that his rights under . . . the Delaware Constitution had been violated"), *overruled on other grounds* by *Rauf v. State*, 145 A.3d 430 (Del. 2016).

[28] App. to Opening Br. at A872.

- failing to object to irrelevant testimony from Cindy regarding the emotional state of Sarah's younger sister following the May 28, 2014 incident;

- failing to object to testimony from Cindy that Green would hit her mother as evidence of a prior bad act;

- failing to object to irrelevant testimony by Trooper Thomas Ford, the second prosecution witness and a member of the Delaware State Police who was dispatched to Sarah's residence after Cindy called 911, about Cindy's demeanor when Ford arrived;

- failing to object to Tracy's testimony that she no longer considered Green to be her husband because of "what he done to [her] daughter";[29]

- objecting to Tracy's testimony that Green had threatened to kill her and her children, but stating the wrong grounds for the objection;

- failing to object to Tracy's testimony that she and the children no longer lived in the house on Stevens Street because her children "don't want to go home there after [the May 28, 2014 incident] happened,"[30] which, according to Green, was improper vouching;

- failing to object to the chief investigating officer's testimony about Tracy's demeanor and disbelief during his interaction with her at the hospital on the night of the incident and similar testimony from another officer about Cindy's demeanor;

- failing to object to the chief investigating officer's testimony suggesting that Green was incarcerated when the officer obtained a DNA swab from Green;

- failing to object when the SANE nurse began to recount what Sarah had told her during the SANE examination as inadmissible hearsay;

---

[29] *Id.* at A829, citing A259–60.
[30] *Id.* at A831, citing A268.

16

- failing to request a mistrial, rather than a curative instruction, after the SANE nurse testified that she believed what Sarah told her during the SANE examination;

- failing to object to three police witnesses' reference to Sarah as "the victim";

- failing to object, during the prosecution's closing argument, to a passing reference to the current status of Tracy's and Green's relationship;

- failing to object, during closing argument, to the prosecutor's reference to the pelvic examination Sarah underwent at the hospital;

- failing to object, during closing argument, to the prosecutor's reference to Sarah as a "kid";

- failing to effectively cross-examine Sarah about an inconsistency between certain trial testimony and a statement she made during the May 29, 2014 interview at the Child Advocacy Center; and

- failing to request a specific-unanimity instruction regarding the specific nature of the sexual intercourse with which Green was charged under the rape counts (despite Green's acquittal on those counts).

Green alleged that he suffered prejudice justifying postconviction relief in consequence of each of these alleged performance deficiencies, but also that "[t]he cumulative prejudice of each instance of ineffective performance enumerated above mandate that Mr. Green's convictions be reversed."[31]

In accordance with the trial court's scheduling order, Green's trial counsel submitted an affidavit responding to each of Green's claims. In that affidavit, trial

---

[31] App. to Opening Br. At A869.

counsel justified her failure to object to arguably inadmissible testimony on two alternative grounds: testimony supported the defense strategy or the testimony did not strike her as prejudicial in the context of the trial as it unfolded. In its opposition to the Motion, the State noted that "[t]he overarching theme of trial counsel's reasoning for not objecting [was] that she was trying to demonstrate that [Cindy] and Sarah had a long-standing bias against [Green] . . . and did not believe that her 'failure to object was prejudicial . . . .'"[32]

### 6. The Superior Court's Denial of Green's Motion

Although Green requested an evidentiary hearing in the Motion, none was held. Instead the commissioner decided the Motion on the papers, which included an eight-hundred-page appendix that contained transcripts of the entire trial, the State's response to the Motion with exhibits, trial and appellate counsel's affidavits, and Green's 36-page reply.

The commissioner correctly initiated her analysis with a consideration of the procedural-bar rules found in Superior Court Criminal Rule 61(i), but also considered whether Green's claims could withstand the prejudice analysis mandated by *Strickland v. Washington*.[33] The commissioner ultimately "recommend[ed] that Green's motion be denied as procedurally barred by Rule 61(i)(3) and (4) for failure

---

[32] *Id.* at A908.
[33] 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

18

to prove cause and prejudice and as previously adjudicated."[34]  Green filed timely objections to the Commissioner's Report and Recommendation as permitted by Superior Court Criminal Rule 62(a)(5)(ii).  After a cursory discussion of the merits of Green's ineffective assistance-of-counsel claims, the Superior Court found that Green failed to demonstrate that, but for his trial counsel's decisions, the outcome would have been different.  The court therefore followed the commissioner's recommendation and denied the Motion. We note—and will discuss in greater detail below—that the court adopted the Commissioner's Report and Recommendation "in its entirety,"[35] thus endorsing the commissioner's procedural-bar analysis. Green appealed.

### 7.  Green's Contentions on Appeal

On appeal, Green challenges the Superior Court's determination that his ineffective-assistance of counsel claims were procedurally barred by Rule 61(i)(3) and (4).  Green also contends that the Superior Court erred to the extent that it rejected those claims on the merits.

This time around Green presents his ineffective-assistance claims in a slightly different format, stating them as four separate claims.  First, Green argues that the Superior Court erred in finding that his trial counsel's failure to request a mistrial

---

[34] 2019 WL 6216247, at *7.
[35] *Id.* at *2.

19

after the SANE nurse testified that she believed Sarah's statements during the sexual assault examination did not amount to ineffective assistance. Second, Green contends that the Superior Court should have found his trial counsel ineffective because she did not effectively cross-examine Sarah about a prior inconsistent statement. Third, Green claims that the Superior Court erred by failing to find his trial counsel ineffective for failing to request a specific-unanimity instruction. And fourth, Green claims that the Superior Court erred by not finding that his trial counsel was ineffective "for failing to object to a myriad of impermissible testimony and evidence."[36] This, according to Green, exposed the jury to "[m]ultiple instances of hearsay, vouching, prior consistent statements, and evidence or argument designed to inflame the [jury's] passions . . . ."[37] Accordingly, Green asks us to reverse the judgment of the Superior Court.

## III. ANALYSIS

This Court reviews the Superior Court's denial of a motion for postconviction relief under an abuse-of discretion standard.[38] We review legal or constitutional questions, including ineffective-assistance-of-counsel claims, *de novo*.[39]

---

[36] Opening Br. at 10. This claim encompasses 14 of the 18 ineffective-assistance claims listed on pp. 15–17, *supra.*
[37] *Id.*
[38] *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013).
[39] *Id.*; *Starling v. State*, 130 A.3d 316, 325 (Del. 2015).

20

### A.    The *Strickland* standard

Because all of Green's substantive claims are based on his allegations that his trial counsel was ineffective, we begin our discussion with a review of "the well-worn standards"[40] applicable to such claims as announced by the United States Supreme Court in *Strickland v. Washington*.[41]  Under Strickland's two-part test, to establish that his Sixth Amendment right to effective assistance of counsel was violated, Green must show, first, that his counsel's representation fell below an objective standard of reasonableness and, second, that the deficiencies in counsel's representation caused him substantial prejudice.[42]

The first part of the *Strickland* test—frequently referred to as the performance prong—places a heavy burden on Green.  He must overcome "a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."[43]    In indulging this presumption, when we review counsel's performance we engage in an objective inquiry into "not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'"[44]  The burden of persuasion is on Green to show that his counsel's performance was

---

[40] *Ploof*, 75 A.3d at 820.
[41] 466 U.S. 668.
[42] *Id.* at 687–88.
[43] *Id.* at 689.
[44] *Burger v. Kemp*, 483 U.S. 776, 107 S. Ct. 3114, 3126, 97 L.Ed. 2d 638 (1987) (quoting *United States v. Cronic*, 466 U.S. 665, n.38, 104 S. Ct. 2039, 2050, n.38, 80 L. Ed. 2d 657 (1984)).

objectively unreasonable, *i.e.*, that no reasonable lawyer would have conducted the defense as his lawyer did.[45]  Indeed, "[i]f an attorney makes a strategic choice after thorough investigation of law and facts relevant to plausible options, that decision is virtually unchallengeable . . . ."[46]  We keep in mind, however, that although strategy satisfies the *Strickland* requirements, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable."[47]  Moreover, "it is important to remain cognizant that [trial counsel's] performance, *viewed as a whole*, is what matters" under *Strickland*.[48]

The second part of the Strickland test—the so-called prejudice prong—is also a formidable obstacle in Green's path:

> To demonstrate prejudice caused by counsel's ineffectiveness, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability means a probability sufficient to undermine confidence in the outcome, a standard lower than more likely than not.  The likelihood of a different result must be substantial not just conceivable.[49]

We may dispose of an ineffective-assistance claim based on the absence of sufficient prejudice without addressing the performance prong if, in fact prejudice is lacking.[50]

---

[45]*Id.* at 791.

[46] *Purnell v. State*, 106 A.3d 337, 342 (Del. 2014) (quoting *Hoskins v. State*, 102 A.3d 724, 730) (internal quotation marks omitted).

[47] *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 1037, 145 L.Ed.2d 985 (2000)

[48] *Atkins v. Zenk*, 667 F.3d 939, 945 (7th Cir. 2012) (emphasis in the original).

[49] *Starling*, 130 A. 3d at 325 (footnotes and quotation marks omitted).

[50] *Strickland*, 466 U.S. at 697.

## B. Green's ineffective-assistance of counsel claims are not procedurally barred.

We first address the Superior Court's conclusion that Green's Motion was procedurally barred under Superior Court Criminal Rule 61(i). As noted, the commissioner recommended "that Green's motion be denied as procedurally barred by Rule 61(i)(3) and (4) for failure to prove cause and prejudice and as previously adjudicated."[51] And although the trial judge's order adopting the commissioner's recommendation and denying Green's Motion does not explicitly endorse the commissioner's procedural-bar analysis, it clearly adopts the Commissioner's Report and Recommendation "in its entirety." Thus, even though both the commissioner and the trial judge considered Green's ineffective-assistance claims on the merits and reached a conclusion with which we agree—that Green has failed to show prejudice under *Strickland*—we are constrained to review the court's procedural-bar analysis here.

Superior Court Criminal Rule 61(i) sets forth several procedural bars to relief, two of which are relevant to the Superior Court's denial of Green's Motion. The first—the procedural-default bar—is found in Rule 61(i)(3), which commands that

> [a]ny ground for relief that was not asserted in the proceedings leading
> to the judgment of conviction, as required by the rules of this court, is
> thereafter barred, unless the movant shows
>> (A) Cause for relief from the procedural default and
>> (B) Prejudice from the violation of the movant's rights.

---

[51] *Green*, 2019 WL 6216247, at *7.

23

The commissioner's analysis of the applicability of this procedural-default bar was on the right track when she initially concluded that "Green's ineffective assistance of counsel claims are not subject to the procedural-default rule in part because the Delaware Supreme Court will not generally hear such claims for the first time on direct appeal."[52] Yet, despite this conclusion, the commissioner applied Rule 61(i)(3)'s cause-and-prejudice test—albeit in a roundabout way—by conflating *Strickland's* prejudice prong with Rule 61(i)(3)'s prejudice prong.

The commissioner's foray into Rule 61(i)(3)'s cause-and-prejudice thicket was unwarranted. Simply put, ineffective-assistance claims are not subject to Rule 61(i)(3)'s bar because they cannot be asserted in the proceedings leading to the judgment of conviction under the Superior Court's rules and this Court's precedent.[53] Put yet another way, the failure to assert an ineffective-assistance-of-counsel claim in the proceedings leading to the judgment of conviction is not a procedural default.

---

[52] *Id.* at *5.

[53] Our concurring colleague concludes that "[t]he commissioner did not find that Green's ineffective assistance of counsel claims are barred in this postconviction proceeding" and that, as we understand him, only Green's "particular claims were procedurally barred . . . ." *Infra* at 51–52. We read the Commissioner's Report and Recommendation differently, basing our interpretation on the fact that the only claims in Green's motion for postconviction relief, which the commissioner recommended be denied as procedurally barred, were ineffective-assistance claims. But ultimately what is most important is that we agree that Green's motion was not procedurally barred.

Nor does the commissioner's application of Rule 61(i)(4)'s procedural bar withstand analysis. That section of Rule 61 provides that "[a]ny ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a post conviction proceeding, or in a federal habeas corpus proceeding is thereafter barred."[54]

For starters, the commissioner's finding that some of Green's claims had been previously adjudicated was equivocal:

> To some extent Green's litany of errors alleged to have been made by Trial Counsel are similar to his claims on direct appeal, concerning his Trial Attorney's failure to have objected to testimony. Consequently these claims should be procedurally barred.[55]

Leaving aside that this statement is unclear as to which of Green's numerous claims are "similar to his claims on direct appeal," the mere fact that a postconviction relief claim might bear some resemblance to a formerly adjudicated claim does not trigger Rule 61(i)(4)'s bar.

To be sure, on direct appeal we examined the effect that the admission of questionable evidence had on the outcome of Green's trial—an inquiry that is also relevant to Green's ineffective-assistance claims. There are times, too, when our prior rejection of a substantive appellate claim will render a follow-on ineffective-assistance claim futile. For instance, if on direct appeal we were to reject a claim

---

[54] Super. Ct. Crim. R. 61(i)(4).
[55] App. to Opening Br. at A1080.

that the trier of fact considered inadmissible evidence, a claim in postconviction relief proceedings that trial counsel was ineffective for not objecting to the evidence would be futile and might rightly be considered formerly adjudicated. But that is not what happened here.

On the contrary, in Green's direct appeal, we did not address the underlying merits of Green's substantive claims but, instead, concluded that even if the substantive claims had merit, there was no plain error. That conclusion relied on the isolated nature of the claimed errors and, as previously mentioned, the overwhelming evidence of Green's guilt on the charges of which the jury found him guilty. In this postconviction relief proceeding, however, Green has identified numerous alleged performance deficiencies that bear no direct relationship to his direct-appeal claims. In effect, he is now saying that the errors that we said were not plain in our direct-appeal opinion were not isolated at all. Under these circumstances, it cannot be seriously contended that his ineffective-assistance claims, which, as we have noted, could not have been brought in the proceedings leading to the judgment of conviction or in the appeal of that conviction, were nevertheless adjudicated in those proceedings. As such, Green's claims are not barred under Rule 61(i)(4), and we reject the Superior Court's conclusion to the contrary.

26

Fortunately, the Superior Court's application of Rule 61(i)'s procedural bars notwithstanding, the court—at both the commissioner and trial judge levels—also addressed Green's claims on the merits. Therefore, we need not reverse on this ground, but instead turn next to the Superior Court's rejection of those claims under *Strickland.*

**C.** **The Superior Court did not abuse its discretion when it determined that Green's trial counsel's failure to request a mistrial during the SANE nurse's testimony was not ineffective within the meaning of *Strickland.***

Green claims that his trial counsel was ineffective because she failed to request a mistrial after the SANE nurse testified during direct examination by the State that she "believe[d] what [Sarah] said" during the SANE examination at the hospital. The relevant exchange between the prosecutor and the SANE nurse was brief:

> Q.    Can you opine whether [Sarah's] statement to you about what happened was consistent with the injury or lack of injury you saw?
>
> A.    What I can say is there is a blunt force trauma to that area because there was injury.
>
> Q.    And can you say whether that was consistent with what she had described happening to her?
>
> A.    I mean I believe what she said, so yes.[56]

After trial counsel objected, the court provided the following curative instruction:

---

[56] App. to Opening Br. at A420.

27

Ladies and Gentlemen, I'm going to instruct you at this stage to disregard the testimony regarding a personal opinion of the witness as to the credibility . . . of another individual in this case.

You, as a jury, are the sole determiners of credibility. And you are to put no weight on the opinion of another person testifying as to whether someone is truthful or not; that is based on your assessment of credibility of the witnesses. So, given that, that answer will be stricken . . . .[57]

Green argued on direct appeal that the SANE nurse's testimony was so unfairly prejudicial that, even though "the Superior Court instructed the jury to disregard the opinion and the defense did not request a mistrial, the inadmissible [vouching testimony] warranted a new trial."[58] Thus, in effect, Green argued that the court should have granted a mistrial *sua sponte*. After acknowledging the impropriety of the SANE nurse's remark—but also that a mistrial is a remedy of last resort—we concluded that Green's claim was without merit and that the trial judge "did not plainly err by continuing with the trial."[59] And our rejection of Green's cumulative-error claim on the grounds that the prejudicial effect of the numerous errors—admission of the SANE nurse's testimony among them—Green alleged on direct appeal were "far outweighed by the overwhelming evidence of his guilt" implicitly rejects Green's present claim that the SANE nurse's testimony standing alone was prejudicial.

---

[57] *Id.* at A423.
[58] *Id.* at A774.
[59] *Green*, 2016 WL 4699156, at 3.

28

Undeterred by our rejection of his direct appellate claim based on the SANE nurse's testimony, Green now recasts that claim as an ineffective-assistance-of-counsel claim. To distinguish this claim from his direct-appeal claim, Green observes that "[w]hen considering [his] direct appeal, this Court did not rule that a mistrial would have been appropriate if requested. . . ."[60] Green also notes that, had his lawyer asked for a mistrial, our review on direct appeal—in the event, plain-error review—would have been "under the less stringent abuse of discretion standard."[61] But while this distinction might suffice to avoid Rule 61(i)(4)'s "formerly adjudicated" bar, if Green is to prevail he still must show that it was objectively unreasonable for his lawyer not to request a mistrial and that, in consequence, he suffered prejudice. For several reasons this argument fares no better than its direct-appeal precursor.

To begin with, Green's contention that his lawyer's failure to request a mistrial was objectively unreasonable is conclusory. In fact, in his opening brief on appeal, Green does not address *Strickland*'s performance prong as it relates to this claim at all, merely stating that his trial counsel "should have requested a mistrial . . . [and that] [f]ailure to do so was ineffective."[62]

---

[60] Reply Br. at 3.
[61] *Id.*
[62] Opening Br. at 17.

To be sure, in Green's reply brief, he expands on this contention. Specifically, he points to trial counsel's reaction to the trial judge's suggestion, following counsel's objection, that a curative instruction would be appropriate. This comment—that "I think the damage is done"—according to Green, shows that trial counsel recognized the inadequacy of a curative instruction, rendering her decision to forgo a mistrial request "professionally unreasonable."[63] We disagree.

Green's attack on his trial counsel's performance does not account for the standard by which we assess the sufficiency of performance under *Strickland* and its progeny. In particular, every missed opportunity to seek relief in the wake of a witness's improper slip of the tongue—in this instance, in an answer that was not responsive to the prosecutor's question—does not constitute ineffective assistance of counsel. Our review "has nothing to do with what the best lawyers would have done . . . [or] even what most good lawyers would have done"[64] in a given situation. Rather, a lawyer's performance is constitutionally deficient only if no competent attorney would have chosen the challenged course of action.[65]

We have consistently observed that declaring a mistrial is a remedy of last resort and is "mandated only when there are no meaningful practical alternatives to

---

[63] Reply Br. at 2.
[64] *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).
[65] *Premo v. Moore*, 562 U.S. 115, 124 (2011), 131 S. Ct. 733, 741, 178 L. Ed. 2d 649 (2011).

that remedy."[66] Relatedly, we have recognized that "[a] trial judge sits in the best position to determine the prejudicial effect of an unsolicited response by a witness on the jury."[67] Thus, whether to grant a mistrial is committed to the discretion of the trial judge. And "prompt curative instructions 'are presumed to cure error and adequately direct the jury to disregard statements.'"[68] Viewed against this backdrop, we conclude that it is highly improbable that the trial judge in this case would have granted a mistrial had one been requested or that we would have found fault with the decision had it been appealed. It was therefore objectively reasonable for Green's counsel to refrain from making such a request. Likewise, given the improbability that a mistrial would have been ordered, Green suffered no prejudice in consequence of his lawyer's decision.

### D. Green's ineffective-assistance claim based on his trial counsel's allegedly ineffective cross-examination of the complainant satisfies neither of the *Strickland* prongs.

During direct examination, Sarah, when asked about the May 28, 2014 Allegations, testified that Green penetrated her vagina with his penis. But during the CAC interview that occurred on May 29th, Sarah told the interviewer that Green only performed an act of cunnilingus after which he ejaculated on her buttocks and

[66] *Revel v. State*, 956 A.2d 23, 27 (Del. 2008) (quoting *Dawson v. State*, 637 A.2d 57, 62 (Del. 1994)) (internal quotation marks omitted); *see also Phillips v. State*, 154 A.3d 1130, 1144 (Del. 2017).

[67] *Pena v. State*, 856 A.2d 548, 550 (Del. 2004).

[68] *Revel*, 956 A.2d at 27 (quoting *Brown v. State*, 897 A.2d 748, 752 (Del. 2006)).

then left the room. Green's trial counsel did not confront Sarah with this apparent inconsistency on cross-examination, and that failure, according to Green, rendered her trial performance constitutionally ineffective.

Green's contention ignores three important considerations. In the first place, it ignores the vigor with which defense counsel cross-examined the then-14-year-old Sarah, establishing the cornerstone of the defense strategy—that both Sarah and her sister Cindy did not like Green and would lie to hurt him. But much more than that, the strategy appears to have worked. It seems obvious to us that the jury formed serious doubts about Sarah's credibility. Indeed, the jury acquitted Green on all counts, except those that were supported by physical evidence. And finally, given the inroads on Sarah's credibility that Green's trial counsel believed she had made, it was objectively reasonable, in our view, for her to forgo the exploration of the details of her client's encounter with his 13-year-old "stepdaughter." Where, as here, the trial counsel's decisions are part of a reasonable trial strategy and objectively reasonable, we will defer to those decisions.[69] It was therefore not an abuse of discretion for the Superior Court to deny postconviction relief on this ground.

---

[69] *State v. Davenport*, 2018 WL 3584437, at *2 (Del. Super. Ct. July 24, 2018) ("The Court will defer to reasonable strategic decisions of Trial Counsel."), *aff'd*, 212 A.3d 804 (Del. 2019).

**E.    It was not objectively unreasonable for Green's trial counsel to refrain from requesting a specific-unanimity instruction.**

Green's next argument is that the Superior Court erred when it found that his trial counsel's failure to request a specific-unanimity instruction did not amount to ineffective assistance of counsel warranting relief from his convictions.  As we understand Green's claim, he contends that, because multiple counts of the indictment contained identical language even though they addressed different forms of sexual intercourse, "it is possible the jurors believe [Green] attempted to engage in intercourse with [Sarah], but were not unanimous as to the attempted method."[70] According to Green, the jury should have been instructed that they had to be unanimous as to the *actus reus* to convict.  He lays blame for the absence of such an instruction at his lawyer's feet and points to the likelihood of confusion in the minds of the jury as causing prejudice.

We recently addressed the difference between general-unanimity and specific-unanimity instructions:

> A general unanimity instruction informs the jury that the verdict must be unanimous, whereas a specific unanimity instruction indicates to the jury that they must be unanimous as to which specific act constitutes the offense charged.  A general unanimity instruction typically suffices to insure [*sic*] that the jury is unanimous on the factual basis for a conviction.  But the general rule does not apply when there are factors in a case which create the potential that the jury will be confused.  In *Probst v. State*, we recognized an exception to that might apply under one such scenario.  Under the exception a more specific-

---

[70] Opening Br. at 36.

unanimity instruction is required if (1) the jury is instructed that the commission of any one of several alternative actions would subject the defendant to criminal liability, (2) the actions are conceptually different and (3) the State has presented evidence on each of the alternatives.[71]

We also noted that the exception recognized in *Probst* is a limited one. Indeed, *Probst* itself emphasized that "a general-unanimity instruction is usually sufficient in the absence of a defense request for a specific instruction or in the absence of unusual circumstance creating a potential for confusion . . . ."[72]

Here, it is doubtful that the *Probst* exception is applicable. After all, in *Probst*, the prosecution argued two different theories of liability; under one, Probst shot the victim and, under the other, Probst was an accomplice to her brother's shooting of the victim. In Green's case, there was but one theory of liability; he committed the offenses charged in the indictment. Green himself admits, moreover, that "the prosecutor did an admirable job during the State's closing argument of specifying which count correlated to which alleged act . . . ."[73]

But we need not determine whether it would have been appropriate to give a specific-unanimity instruction had Green's counsel asked for one. That is so because trial counsel's failure to request the instruction was, we conclude, objectively

---

[71] *Jones v. State*, 237 A.2d 1097 (Table), 2020 WL 1845887, at *5 (Del. April 13, 2020) (quoting *Probst v. State*, 547 A.2d 114, 120–22 (Del. 1988)) (footnotes, quotations, and brackets omitted).
[72] *Probst*, 547 A.2d at 122.
[73] Opening Br. at 35.

34

reasonable. We base this conclusion on two reasons. First, there is no suggestion that any of the trial court's instructions were incorrect. "As a general rule, a defendant is not entitled to a particular instruction, but he does have the unqualified right to a correct statement of the law."[74] And as we noted in *Probst*, a general-unanimity instruction typically suffices to ensure that the jury is unanimous on the factual basis for a conviction.[75] Second, we agree with Green's characterization of the State's closing argument; the prosecutor was at pains to specify clearly the type of sexual activity that formed the basis of each count. In the face of these two factors—correct and generally informative instructions and clear guidance as to the conduct implicated in each count—we cannot say that it was objectively unreasonable to conclude that the general-unanimity instruction was sufficient.

### F. Green's ineffective-assistance claim based on a "myriad" of alleged performance deficiencies is without merit.

In addition to the specific claims of ineffectiveness discussed above, Green claims that his trial counsel was "ineffective for failing to object to multiple instances of improper vouching, hearsay, use of the word 'victim' and argument introduced to inflame the passions of the jury."[76] These claims, we presume, are what prompted

---

[74] *Smith v. State*, 913 A.2d 1197, 1241 (Del. 2006) (quoting *Bullock v. State*, 775 A.2d 1043, 1047 (Del. 2001)).
[75] *Probst*, 547 A.2d at 120.
[76] Opening Br. at 37.

the commissioner to characterize Green's motion as "nit picking Monday Morning Quarterbacking"[77] and to dismiss them summarily.[78] We disagree with this characterization and believe that a more substantive response is in order. We now offer that response.

### 1. Improper vouching

Leaving aside Green's complaint that Dawn Culp improperly vouched for Sarah's credibility, which prompted the court to give a curative instruction, Green sprinkles the Motion and his briefs with references to what he calls "improper vouching" by prosecution witnesses. He claims that his lawyer's failure to object to this purported tactic rendered her ineffective. But none of the testimony with which Green finds fault on the vouching score—save Culp's testimony—falls within the definition of vouching that we have condemned.

A review of Green's vouching allegations illustrates this point. Green points to Trooper Ford's testimony that, when he interviewed Sarah's sister, Cindy, on the night of May 28, she was "very upset about what . . . [Sarah] had told her"[79] about

---

[77] *Green*, 2019 WL 6216247, at *7.

[78] We also admit to certain misgivings about the conclusory—and, one might even say, derogatory—nature of the commissioner's findings. Rather than address Green's nonfrivolous claims on the merits, the commissioner characterized those claims collectively as "nit picking Monday Morning quarterbacking." *Id.* at *7. That characterization is, in our view, unduly harsh. From our perspective, court-appointed counsel's presentation of Green's claims, none of which could fairly be characterized as frivolous, has been effective and consistent with his professional obligations.

[79] Opening Br. at 45.

what had happened that night. Green complains that "the only possible purpose of eliciting such testimony from the officer was to convey to the jury that [Cindy] was upset over [Sarah's] accusation against Mr. Green because she believed it to be true."[80] This, in our view, is not the type of statement that the prohibition against improper vouching is designed to keep from the jury. It is not a statement by a witness who the jury will naturally think has superior access to information and whose opinions about a witness's truthfulness will tend to hold a particular sway— such as a prosecutor or police officer.[81]

Similar to his objection to the testimony about Cindy's demeanor, Green contends that other testimony about witnesses' demeanor or conduct—as opposed to what the witnesses said about Sarah's credibility—amounted to improper vouching. Under his vouching framework, testimony regarding Tracy's demeanor at the hospital and the deterioration of her relationship with Green is clearly objectionable as vouching because it suggests that Tracy believed Sarah's allegations. We do not view the prohibition against vouching that broadly. Nor has Green cited any authority in support of his contention that the rule should operate in

---

[80] *Id.*

[81] The preponderance of our vouching cases involve prosecutors' and police officers' insinuations about the credibility of witnesses. *See, e.g.*, *Whittle v. State*, 77 A.3d 239, 244 (Del. 2013), *as corrected* (Oct. 8, 2013) ("[B]ecause prosecutors are officers of the court and representatives of the State, '[m]embers of the jury are likely to assume that prosecutors will satisfy their heightened obligations of impartiality.'") (quoting *Trump v. State*, 753 A.2d 963, 967 (Del. 2000)); *Holtzman v. State*, 718 A.2d 528 (Table), 1998 WL 666722, at *5 (Del. 1998) (holding that a police officer's vouching of a witness's credibility was improper).

the manner he proposes. But even if we were to adopt Green's novel conception, we nevertheless would not find his counsel's failure to object to have been objectively unreasonable. Stated differently, we do not accept the proposition, implicit in Green's argument, that no competent attorney would have missed the opportunity to object to the challenged testimony on the grounds that it constituted improper vouching.[82]

Although we could end our discussion of Green's improper-vouching claim here, we also conclude that the admission of the purportedly improper testimony was not prejudicial. That Tracy tended to believe her daughter—and Cindy, her sister—would likely have been inferred by the jury in light of their other testimony. We thus reject the notion that their credulity affected the outcome of Green's trial in any meaningful way.

### 2. Hearsay

Green also claims that the Superior Court erred by not finding that his lawyer was ineffective for failing to object to certain hearsay statements.

In particular, Green faults his lawyer for not objecting to the following:

---

[82] *See Premo*, 562 U.S. at 124 (When assessing the reasonableness of counsel's decision to refrain from seeking the exclusion of evidence because such an effort was likely to fail, the relevant question under *Strickland* is whether no competent attorney would have taken the action counsel did.)

- Cindy's testimony during her direct examination by the prosecutor that Sarah told her on May 28, 2019 that "Todd raped me and it wasn't the first time."[83]

- Cindy's testimony that she told the 911 operator that her stepfather had raped her sister.[84]

- Cindy's testimony that, when she called her aunt after the 911 call, she told her aunt that "[Sarah] told [her] that Todd raped her."[85]

- The SANE nurse's recounting of Sarah's responses during the interview she conducted at the hospital as part of her examination.[86]

The State counters that the challenged statements attributed to Sarah are not hearsay at all under D.R.E. 801(d)(1) and, even if they were, they are admissible under the exceptions found in D.R.E. 803(a) (excited utterances) and 803(4) (statements made for medical diagnosis or treatment). Although the State's response stands on shaky grounds, it is unnecessary for us to work through the parties' respective treatment of the rules of evidence. That is because counsel's decision not to object in each of these instances was well "within the wide range of reasonable professional assistance"[87] recognized as the gauge of competence under *Strickland*.

Green's trial counsel explained in her affidavit that, as a matter of strategy, she wanted Cindy to testify freely about her communications with Sarah on the night

---

[83] App. to Opening Br. at A176.
[84] *Id.*
[85] *Id.*
[86] *Id.* at A140–145.
[87] *Strickland*, 466 U.S. at 669.

in question. This would allow the jury to hear that, when Cindy first encountered Sarah, who was visibly upset, Cindy asked Sarah if her call earlier that evening was "about drugs or alcohol."[88] Green explained in her affidavit that "[she] wanted the jurors to ponder whether [Sarah] was potentially using drugs or alcohol . . . ."[89] Having not objected to this testimony, which touched upon the out-of-court conversation at issue, trial counsel feared that an objection to other parts of the conversation might be misinterpreted by the jury. Choosing not to object under these circumstances, especially considering the fact that the declarant (Sarah) would be testifying, was objectively reasonable. And once that cat was out of the bag, it would serve little purpose to object to Cindy's reports to the 911 operator and her aunt.

Likewise, Green's trial counsel articulated a strategic basis for allowing the SANE nurse to recount her interview of Sarah at the hospital. Counsel "intend[ed] to point out the inconsistencies in [Sarah's] testimony . . . , [including] the inconsistencies [in] what she testified to on the stand and what she told Ms. Culp [the SANE nurse]."[90]

But we also recognize that the absence of an objection was justified on other grounds. Under 11 *Del. C.* § 3507, "[i]n a criminal prosecution, the voluntary out-of-court statement of a witness who is present and subject to cross-examination may

---

[88] App. to Opening Br. at A176.
[89] *Id.* at A884–86.
[90] *Id.* at A888.

40

be used as affirmative evidence with substantive independent testimonial value." To be sure, when the challenged testimony was offered, the foundation for admitting Sarah's out-of-court statements under Section 3507 might not yet have been laid. But we are confident that, had a hearsay objection succeeded in keeping the testimony from the jury, this alternative avenue for admission was available. For present purposes, whether the prosecutor would have traveled down that road is beside the point. What is relevant here is that experienced defense counsel will often forgo technically valid evidentiary objections when she knows that the contested evidence will inevitably come before the jury. Under the objective standard that applies when assessing the competence of counsel's trial performance, this alone is sufficient to defeat Green's claim.

### 3.    Reference to Sarah as "victim"

We turn now to Green's attack on his trial counsel's failure to object when each of the three police witnesses referred to Sarah as the "victim." We count eleven such references: seven by Trooper Ford, three by Detective Anderson, and one by Detective Christie.

Green's argument traces its origin to our observation in *Jackson v. State*, a rape[91] case in which the complaining witness's consent was in dispute:

---

[91] When Jackson was charged, the Delaware Criminal Code called the crime that had been traditionally and is now described as "rape" as "unlawful sexual intercourse."

If there is no dispute that a crime has, in fact, occurred, there is no harm in referring to the existence of a victim. In a narrow range of cases, such as this, such use is clearly unwarranted. It is improper for a prosecutor to assume as a given, or to suggest to the jury, the existence of that which is in dispute. It is a practice to be avoided, but, as the opinion emphasizes, in the absence of an objection it does not constitute plain error.[92]

We further noted that where the accused's defense, if accepted, would show that no crime had been committed, "it is incompatible with the presumption of innocence for the prosecutor to refer to the complaining witness as the 'victim.'"[93] In *Mason v. State*, however, we held that "reference to a complainant as a 'victim' is not objectionable in all cases where the commission of a crime is disputed; it is only objectionable in those cases where consent is the sole defense."[94]

In this case, because of Sarah's age, consent was not available as a defense. It therefore cannot be said that the failure to make an objection that would be directly contrary to our holding in *Mason* was objectively unreasonable.[95]

---

[92] 600 A.2d 21, 25 (Del. 1991).

[93] *Id.*

[94] 692 A.2d 413 (Table), 1997 WL 90780, at *2 (Del. 1997).

[95] This holding should not be viewed as an affirmation of *Mason*'s holding that references to a complainant as the "victim" are only objectionable in cases where the sole defense is consent. Other opinions, including *Jackson*, suggest that the practice is objectionable whenever the defense, as here, is that no crime was committed against the complainant. Because we find that it would be objectively reasonable for Green's counsel to rely on *Mason*, we need not address this tension between these two perspectives.

### 4.  Prior bad acts

Cindy testified that her relationship with Green had deteriorated "because [she] found out that he would hit [her] mom."  Green's lawyer did not object.  Nor did she object when Tracy testified that her move to Delaware was prompted by threats Green made against her and her children.  Green contends that the testimony about Green's threats and domestic violence was improper character evidence and inadmissible under D.R.E. 404(b).  He further asserts that his lawyer's failure to object rendered her assistance constitutionally ineffective.

This claim ignores that the core defense theme was that Sarah, Cindy, and Tracy all had it out for Green.  Trial counsel wanted to show "that [Cindy] had not liked Mr. Green for years because she 'found out' that he would hit her mother."[96]  As for Tracy's reference to Green's prior threats, trial counsel's affidavit indicates that her failure to object was based, in part, on her knowledge that "prior bad act evidence had been heard by the jury without objection."[97]  Tracy's testimony, moreover, tended, in counsel's view, to show her bias against Green.

Such strategic decisions as Green's lawyer made here are entitled to a strong presumption of reasonableness under *Strickland*.[98]  In that regard, Green does not address the objective reasonableness of the strategic decision; he merely notes the

---

[96] App. to Opening Br. at A886.
[97] *Id.* at A887.
[98] *Strickland*, 466 U.S. at 690.

43

viability of a Rule 404(b) objection. Viable or not, Green's lawyer's decision that the benefit of forgoing objections—allowing testimony showing the witnesses' bias against her client—outweighed the potential prejudice was not, in our opinion, objectively unreasonable.

### 5.   Inflammatory evidence

Green also identifies as inflammatory certain testimony given by a prosecution witness and statements by the prosecutor in closing argument. He contends that his trial counsel's failure to object in these instances constitutes ineffective-assistance under *Strickland*. Green's complaint on this score has three sources: (1) Cindy's testimony about her family's decision not to tell Tia—the youngest child and Green's biological daughter—why her father was no longer living with the family; (2) the prosecutor's reference to Sarah in closing argument as a "kid," "a child," and by her actual age (*e.g.*, eleven-years old); and (3) the prosecutor's statement in closing argument that, Sarah "had to undergo a pelvic exam at the hospital" and that such exams "are not comfortable."[99]

We do not see, nor does Green explain, how these statements were likely to have inflamed the passions of the jury. To be sure, what Tia knew about her father's whereabouts and why he was not at home is of questionable relevance. But it strikes us as relatively innocuous when we consider the subject matter that the jury was

---

[99] Opening Br. at 59 (quoting App. to Opening Br. at A673.)

required to take in to determine Green's guilt or innocence. More harmless yet was the unavoidable reference to Sarah's age. After all, Sarah's age and status as a "child" are elements of several of the crimes Green was charged with committing. And finally, that Sarah underwent a pelvic examination by the SANE nurse was properly before the jury; the depiction of the exam as being "uncomfortable" was superfluous but also, in our view, harmless. We therefore conclude that trial counsel's silence in the face of these statements was objectively reasonable.

### 6. Green's Pretrial Detention

Detective Anderson testified that he obtained a DNA swab from Green "at the James T. Vaughn Prison."[100] The sum total of Green's argument about the impropriety of this comment consists of two sentences:

> Testimony about Mr. Green's incarceration at the time [of] the DNA swab was inadmissible. Trial counsel failed to object, rendering ineffective assistance of counsel.[101]

In *Poteat v. State*, we rejected the defendant's claim that his counsel was ineffective for failing to object to his wearing a prison uniform during the trial.[102] Noting Poteat's acquittal on one charge and his conviction only on a lesser-included charge, we rejected Poteat's claim.

---

[100] *Id.* at A332.
[101] Opening Br. at 50 (footnote omitted).
[102] 931 A.2d 437 (Del. 2007).

45

Here we acknowledge that the detective's reference to Green's incarcerated status was unnecessary and even objectionable. But *Poteat* teaches that a jury's learning that an accused is in prison during a trial is not *per se* prejudicial. It follows that Green's status as a pretrial detainee is likewise not *per se* prejudicial. Because Green has not attempted to identify the actual prejudice he suffered by virtue of Detective Anderson's unfortunate comment—and, in light of the partially favorable jury verdict, we find none—we reject this claim.

## G. Green's cumulative-prejudice claim lacks merit.

Because we conclude that trial counsel's representation of Green was within the wide range of reasonable professional assistance, we need not address Green's claim that his lawyer's alleged deficiencies, viewed cumulatively, deprived Green "of a fair trial, a trial whose result is reliable."[103] Nevertheless, we take this opportunity to share our view that, even if it could be said that Green's counsel put a foot wrong here and there, those slight missteps pale in comparison to her performance on the whole. And the jury's verdict, which included findings of innocence on every count that hinged solely on Green's and Sarah's relative credibility, attests to that view. In short, we can find nothing in counsel's representation of Green that undermines our confidence in the outcome of his trial.

---

[103] *Strickland*, 466 U.S. at 687.

## IV. CONCLUSION

For these reasons, we AFFIRM the Superior Court's November 21, 2019 Order denying Green's motion for postconviction relief.

**VAUGHN**, Justice, concurring,

I write separately because my analysis of the case differs from the panel's very thorough analysis on a few points.

Green asserts five claims on appeal. The first four are claims that he received ineffective assistance of counsel at trial. The U.S. Supreme Court has given us the following guidance for applying the *Strickland v. Washington* test to claims of ineffective assistance of counsel:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing in one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.[104]

In this case, I think Green's four ineffectiveness claims are easily disposed of on the ground of lack of sufficient prejudice. For that reason, I would not reach the *Strickland* performance component.

---

[104] 466 U.S. 668, 697 (1984).

Green's first claim and part of his fourth claim were discussed in his direct appeal. The first claim is that his trial counsel was ineffective for not moving for a mistrial when Nurse Dawn Culp testified that she believed Sarah's allegations of sexual assault. In his fourth claim, he alleges that his trial counsel was ineffective for failing to respond appropriately to multiple instances of inappropriate testimony. One of those instances is the testimony of Sarah's sister Cindy that Green hit her mother. Another is the testimony of Sarah's mother Tracy that she moved from Connecticut to Delaware because Green had threatened to kill Tracy and her daughters. On Green's direct appeal, applying a plain error standard, we found that any prejudicial effect of the testimony of Culp, Cindy and Tracy was "far outweighed by the overwhelming evidence of his guilt."[105]

Green fares no better when the *Strickland* prejudice standard is applied to each of his four ineffective assistance of counsel claims. As to his first claim that trial counsel failed to ask for a mistrial after Culp said she believed Sarah's allegations of sexual assault, any prejudice resulting from Culp's testimony was cured by the trial court's curative instruction. There is no reason to believe that the trial court would have granted a mistrial had one been requested.

Green's second claim is that his trial counsel was ineffective for failing to cross-examine Sarah about an allegedly prior, inconsistent statement. In her

---

[105] *Green v. State*, 147 A.3d 748, 2016 WL 4699156, at *3 (Del. Sept. 7, 2016) (ORDER).

interview with a CAC interviewer shortly after the May 28, 2014 incident, Sarah said that Green licked her breasts and vagina, but she did not say that he penetrated her vagina. At trial, she testified that he penetrated her vagina. However, the jury acquitted Green of rape in the second degree. Since he was acquitted on the rape charge, he suffered no prejudice from counsel's failure to cross-examine Sarah concerning the allegedly prior, inconsistent statement.

Green's third claim is that his trial counsel was ineffective for not requesting a unanimity instruction. A unanimity instruction is given when the State presents alternative factual scenarios as theories of guilt on the same count of an indictment.[106] That did not happen here. Green suffered no prejudice from this alleged failure on the part of trial counsel because he was not entitled to a unanimity instruction.

His fourth claim is the one in which he complains of multiple instances of inappropriate testimony. These alleged multiple instances of inappropriate testimony are discussed in detail by the panel and there is no need for me to repeat them here. Given the overwhelming evidence of Green's guilt on the three charges of which he was convicted, I am satisfied that none of these allegations, either alone or all taken together, are sufficient to undermine confidence in the jury's verdicts.[107]

---

[106] *Probst v. State*, 547 A.2d 114, 121 (Del. 1988).
[107] The panel disagrees with the commissioner's characterization of these claims as "nit picking Monday Morning Quarterbacking." The commissioner's characterization does not bother me.

Green's fifth and final claim is that the Superior Court erred by finding that all his claims were procedurally barred under Superior Court Criminal Rules 61(i)(3) and (i)(4). Rule 61(i)(4) bars claims which have been formerly adjudicated. Green's second and third claims were not raised at trial or on appeal. Some parts of his fourth claim were also not raised at trial or on appeal. These claims are not formerly adjudicated. As to those claims that were raised in the direct appeal, I think the differences in the standards of review for a plain error claim and a *Strickland* ineffectiveness claim, coupled with the fact that ineffectiveness claims cannot be brought in a direct appeal, render those claims not formerly adjudicated. Any error on the commissioner's part in finding that claims are barred by 61(i)(4), however, is harmless since all of the ineffectiveness claims fail on their merits.

Rule 61(i)(3) bars any particular claim which could have been but which was not raised at trial unless the defendant can show cause for relief from the procedural default and prejudice. Cause might be shown, for example, by some external impediment that prevented counsel from raising the claim at trial.[108] Cause can also be established by showing that counsel was ineffective at trial or on appeal.[109] In order to understand the commissioner's ultimate conclusion that Green's claims

---

[108] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990) (citing *Murray v. Carrier*, 477 U.S. 478, 492 (1986)).
[109] *Murray*, 477 U.S. at 488 ("Ineffective assistance of counsel, then, is cause for a procedural default.").

were barred by Rule 61(i)(3) in this case, one must put her ruling in its proper context. The commissioner did not find that Green's ineffective assistance of counsel claims are barred in this postconviction proceeding. It is elementary that an ineffective assistance of counsel claim is not barred in a first postconviction proceeding because it can only be raised postconviction for the first time.[110] The commissioner, recognizing this, dealt with Green's ineffective assistance of counsel claims on their merits.

But Rule 61(i)(3) requires that for particular claims that could have been but were not raised at trial — such as, in this case, that Nurse Culp's vouching for Sarah should have resulted in a mistrial, that Sarah should have been cross-examined about a prior inconsistent statement, that a unanimity instruction should have been given, that the State's witnesses should not have been permitted to refer to Sarah as the victim, etc. — Green must establish cause for relief from the procedural bar of 61(i)(3). That cause is provided, in a case such as this one, by the defendant establishing that the particular claims were not raised due to ineffective assistance of counsel.[111] If the ineffective assistance of counsel claims are successful under

---

[110] *Cf. Desmond v. State*, 654 A.2d 821, 829 (Del. 1994) (en banc) (refusing to consider appellant's claim of ineffective assistance of counsel on direct appeal, as "[t]his Court has consistently held it will not consider a claim of ineffective assistance of counsel on direct appeal if that issue has not been decided on the merits in the trial court").

[111] *See Flamer v. State*, 585 A.2d 736, 753 (Del. 1990) (en banc) ("Finally, Flamer raises claims of ineffective assistance of counsel at trial and on direct appeal. Such claims are appropriate for postconviction relief, because they argue that counsel's defaults precluded the prior proceedings

*Strickland*, cause and prejudice for relief from the procedural bar are established.[112]

If the ineffectiveness claims are not successful, however, the defendant has failed to show cause and prejudice for relief from the procedural bar.[113]

This principle was embodied by this Court in *Younger v. State*, a Rule 61 case in which the defendant claimed that his appellate counsel on direct appeal was ineffective for not raising particular claims in the appeal.[114] The Court found that his claim was time-barred. But the Court also found that his claim was barred by 61(i)(3), stating that "[a]ttorney error short of ineffective assistance of counsel does

---

from being a fair resolution of guilt in accord with then applicable legal principles." (internal citation omitted)). In footnote 53, the panel fails to recognize the distinction between a "ground for relief that was not asserted in the proceedings leading to the judgment of conviction" and the ineffectiveness of counsel claim which is given to explain why the ground for relief was not asserted. *See* Panel Op. at 25 n.53. For example, with respect to Green's first claim involving Culp, the ground for relief not asserted at trial is that her vouching for Sarah entitled him to a mistrial. Green's claim that his counsel was ineffective for not moving for a mistrial explains the default and, if successful, would provide relief from the default. The commissioner's report shows that she is well aware of the distinction. She recognized that "Green's ineffective assistance of counsel claims are not subject to the procedural default rule . . . ." *State v. Green*, 2019 WL 6216247, at *5 (Del. Super. Nov. 21, 2019). In her conclusion, she finds that "counsel represented Green in a competent fashion and was not ineffective. . . . Consequently, I recommend that Green's motion be denied as procedurally barred by Rule 61(i)(3) . . . ." *Id.* at *7. I agree with her conclusion.

[112] *See Taylor v. State*, 32 A.3d 374, 385 n.44 (Del. 2011) (en banc) (recognizing that, while attorney error short of ineffectiveness does not constitute cause sufficient to avoid procedural default, "[t]he converse is also true: attorney error that constitutes ineffective assistance will constitute relief from a procedural default").

[113] *Cf. Gattis v. State*, 697 A.2d 1174 (Del. 1997) ("Several of Gattis' claims were not raised below or on direct appeal because, he alleges, the assistance of counsel was ineffective. Under Superior Court Criminal Rule 61(i)(3), such issues are procedurally barred from appellate review unless the defendant successfully demonstrates that counsel was ineffective and that counsel's ineffectiveness prejudiced his rights. We find Gattis has not overcome the procedural bar.").

[114] 580 A.2d at 555.

not constitute 'cause' for a procedural default even when that default occurs on appeal rather than at trial."[115]

The commissioner could have concluded her analysis after finding that Green's claims of ineffective assistance of counsel lacked merit. It was not error, however, for her to take the next step and find that because his ineffectiveness claims were unsuccessful, his particular claims were procedurally barred under Rule 61(i)(3).

I agree that the judgment of the Superior Court should be affirmed.

---

[115] *Id.* at 556. We borrowed this proposition from the U.S. Supreme Court's decision in *Murray v. Carrier*, 477 U.S. at 492, a case in which the U.S. Supreme Court, in part, addressed the "cause" prong of the procedural default rule, *see id.* at 488-92. This Court has repeatedly relied on that principle in Rule 61 cases. *Cuffee v. State*, 210 A.3d 722, 2019 WL 2000425, at *4 (Del. May 6, 2019) (TABLE); *Kalil v. State*, 93 A.3d 654, 2014 WL 2568029, at *3 n.13 (Del. June 5, 2014) (ORDER); *Taylor*, 32 A.3d at 385 n.44; *Pandiscio v. State*, 670 A.2d 1340, 1995 WL 715627, at *1 (Del. Oct. 25, 1995) (ORDER); *Watson v. State*, 602 A.2d 1082, 1991 WL 181468, at*1 (Del. Aug. 22, 1991) (ORDER); *Flamer v. State*, 585 A.2d 736, 758 (Del. 1990) (en banc); *Younger*, 580 A.2d at 556; *Evans v. State*, 524 A.2d 679, 1987 WL 36985, at *2 (Del. Apr. 6, 1987) (ORDER); *Folks v. State*, 516 A.2d 482, 1986 WL 17828, at *2 n.1 (Del. Sept. 24, 1986) (ORDER).